[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

FILED
U.S. COURT OF
APPEALS
ELEVENTH CIRCUIT
MARCH 21, 2012
JOHN LEY

No. 11-15548
_____

D.C. Docket No. 2:11-cv-00438-MEF-TFM

THOMAS D. ARTHUR,

Plaintiff - Appellant,

versus

KIM TOBIAS THOMAS,
Interim Commissioner, Alabama
Department of Corrections in his
official capacity,

ANTHONY PATTERSON,
Warden, Holman Correctional Facility
in his official capacity,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Middle District of Alabama
_____

(March 21, 2012)

Before BARKETT, HULL and WILSON, Circuit Judges.

PER CURIAM:

Thomas D. Arthur, an Alabama state prisoner sentenced to death, appeals the dismissal of his 42 U.S.C. § 1983 complaint alleging that Alabama's method of executing inmates by lethal injection violates the Eighth and Fourteenth Amendments to the U.S. Constitution and the separation of powers required by Article III of the Alabama Constitution. Arthur's execution is currently scheduled to take place on March 29, 2012.

Arthur instituted this challenge[1] to Alabama's lethal injection procedure when Alabama announced in 2011 that it would switch from using sodium thiopental to pentobarbital as the first of the three drugs in its lethal injection protocol. Arthur alleges that pentobarbital takes substantially longer to render an inmate fully insensate than sodium thiopental and, as a result of this delayed effect, there is a significant risk that Alabama administers the second and third drugs in its lethal injection procedure before pentobarbital has taken effect.

---

[1] This is not Arthur's first appeal with our Court. The factual and procedural history of his challenges to his conviction and death sentence in the federal courts is recounted in our prior decisions. See Arthur v. Allen, 452 F.3d 1234 (11th Cir.), modified on reh'g, 459 F.3d 1310 (11th Cir. 2006); Arthur v. Allen, 248 Fed. Appx. 128 (11th Cir. 2007); Arthur v. King, 500 F.3d 1335 (11th Cir. 2007); Arthur v. Ala. Dept. of Corr., 285 Fed. Appx. 705 (11th Cir. 2008).

Arthur contends that this deficiency in Alabama's practice of carrying out lethal injections violates his right to be free from cruel and unusual punishment protected by the Eighth Amendment of the U.S. Constitution.

Arthur also alleges that (1) the prison personnel charged with carrying out lethal injections in Alabama fail to follow regular procedures in carrying out lethal injections, in violation of the Equal Protection Clause of the U.S. Constitution; (2) Alabama's policy of keeping information about its lethal injection procedure secret violates the Due Process Clause of the U.S. Constitution; and (3) Alabama's lethal injection policies violate the Alabama Constitution by impermissibly delegating lawmaking authority to prison officials.

Alabama moved to dismiss the complaint. The district court dismissed the Eighth Amendment and Due Process claims on statute of limitations grounds and the Equal Protection claim for failing to state a claim upon which relief can be granted. Having dismissed all of Arthur's federal claims, the district court declined to exercise supplemental jurisdiction over the state law claim. Arthur appeals the dismissal of all four of his claims.

## A.    Eighth Amendment Violation

The district court dismissed Arthur's Eighth Amendment claim on the ground that this claim was barred by Alabama's two-year statute of limitations.

See Powell v. Thomas, 643 F.3d 1300, 1303 (11th Cir. 2011) ("The two-year limitations period . . . applies to section 1983 actions in Alabama.") (internal quotation marks omitted).  In order to defeat Alabama's statute of limitations defense, Arthur must show that he filed his § 1983 complaint within two years of a significant change in Alabama's method of administering lethal injections.  See McNair v. Allen, 515 F.3d 1168, 1177 (11th Cir. 2008).[2]  Arthur contends that he sufficiently alleged that the substitution of pentobarbital in Alabama's execution protocol gives rise to an impermissible risk that an inmate will be subject to substantial pain because the second and third drugs in the protocol will be administered prematurely.  He argues that the district court erred in dismissing his complaint without considering the evidentiary basis of his claim that, in fact, a significant change has occurred in Alabama.

Whether a significant change has occurred in a state's method of execution is a fact-dependent inquiry, which we have treated as such in each of our recent cases addressing the lethal injection protocols of Alabama, Georgia and Florida. Although we concluded in Powell v. Thomas, 643 F.3d 1300 (11th Cir. 2011),

---

[2] Arthur first became subject to lethal injection as a method of execution in Alabama in July 2002. Arthur initiated this action in June, 2011, two months after Alabama announced that it would be substituting pentobarbital for sodium thiopental in its three-drug lethal injection procedure.

DeYoung v. Owens, 646 F.3d 1319 (11th Cir. 2011) and Valle v. Singer, 655 F.3d 1223, 1226 (11th Cir. 2011), that the replacement of sodium thiopental with pentobarbital did not constitute a "significant change" in the lethal injection execution protocol, each of these decisions is premised on the specific factual allegations and/or evidence presented and considered in each of those cases. None of the previous courts that were asked to decide whether the substitution of pentobarbital for sodium thiopental is a "significant change" in the lethal injection protocol could have resolved, nor did they resolve, that claim without considering the facts and evidence. Simply because no court, based on the allegations and evidence that has been presented in cases to date, has found a significant change does not mean that such evidence does not exist. To read our circuit decisions in Powell, DeYoung, and Valle as holding—no matter what new facts allege or new evidence reveals—that Alabama's, Georgia's and Florida's substitutions of pentobarbital for sodium thiopental is not a significant change in their execution protocols is to ignore the reality that scientific and medical evidence that exists today may differ from that which new scientific and medical discoveries and research reveal tomorrow.

Specifically, we held in Powell (Williams) v. Thomas that, based on the district court's review of the evidence and factual findings after a hearing on a

5

death row inmate's motion to stay his execution, "the evidence present" did not demonstrate a "substantial likelihood of success on the merits" of the inmate's Eighth Amendment challenge. 641 F.3d 1255, 1257 (11th Cir. 2011). We did so only after determining that the district court had not "abused its discretion" by deciding to credit an expert report submitted by Alabama, id., and only with the benefit of the district court's finding "that the State's representations about the amended execution protocol were accurate." Id. at 1258. Next, in Powell, we reviewed a complaint presenting identical allegations and relying on the same expert testimony and exhibits as were rejected in Powell (Williams), and we affirmed the dismissal of the complaint because its allegations and supporting evidence were indistinguishable from those in Powell (Williams). 643 F.3d at 1302 (noting that Powell's complaint was "nearly identical" to the one filed in Powell (Williams)); id. at 1303 (reviewing evidence relied on by both Williams and Powell). And in DeYoung and Valle, we affirmed the denial of death-row inmates' motions to stay their executions with the benefit of extensive fact-finding made by the district court at evidentiary hearings conducted in both cases. See 646 F.3d at 1323 (reviewing district court's factual findings); 655 F.3d at 1226 (adopting district court's opinion considering evidence presented at a hearing on a motion for stay of execution).

6

The district court in Arthur's case, however, never considered Arthur's evidence in support of his allegations that there has been a "significant change" to Alabama's execution protocol, instead summarily concluding that his Eighth Amendment claim was barred by the statute of limitations.[3]  Thus, unlike each of our recent precedents dismissing inmates' § 1983 lethal injection execution claims, we have no evidentiary basis whatsoever on which to conclude whether, as Arthur alleges, a "substantial change" in Alabama's administration of its execution protocol has occurred.  McNair, 515 F.3d at 1177.  There has been no finding about the manner in which Alabama administers its lethal injections, no evaluation of whether Alabama's representations are accurate, and no opportunity whatsoever to contradict the State's assertions with Arthur's own evidence.  And the lack of factual development in this record is only exacerbated by Alabama's policy of maintaining secrecy surrounding every aspect of its three-drug execution method.

---

[3]  The dissent asserts that "the interpretation and application of a statute of limitations is a question of law."  However, that our review of the district court's application of a statute of limitations is de novo, is a distinct question from whether a particular statute of limitations involves questions of fact that the district court must determine in the first instance.  See e.g., Kearse v. Sec'y, Fla. Dep't of Corr., ___ F.3d. ___, 2011 WL 7167084 (11th Cir. 2011) (remanding to the district court to determine in the first instance whether federal habeas petitioner's state petition was "properly filed" in order to satisfy the one-year statute of limitations for filing a federal habeas petition under 28 U.S.C. § 2244(d)(2)); Tello v. Dean Witter Reynolds, Inc., 410 F.3d 1275 (11th Cir. 2005) (remanding to the district court for the factual development of the question of "inquiry notice" necessary to the resolution of the statute of limitations question in securities fraud action).

For several reasons, we conclude that Arthur's Eighth Amendment allegations are not so similar to those presented in our previous cases that his complaint can be dismissed on a Rule 12(b)(6) motion. See Anders v. Hometown Mortg. Svcs., 346 F.3d 1024, 1031 (11th Cir. 2003) (holding that disposition of a previous case may bind a subsequent decision only when the "facts and circumstances [are] sufficiently similar to those under which [the previous decision] arose."). In DeYoung, we concluded that the evidence presented at an evidentiary hearing showed that no substantial change had occurred in Georgia's method of execution within two years of the filing of the plaintiff's complaint in 2011. 646 F.3d at 1325 (concluding that the evidence presented did not show a substantial change and proceeding to review this evidence). However, that Georgia's method of execution may not have undergone a substantial change in the relevant time period has no bearing on the factual question of whether a substantial change has occurred in the way that Alabama administers its method of execution, as Arthur's complaint alleges.[4]

Our holdings in Powell and Powell (Williams), unlike DeYoung, involved

---

[4] Similarly, our conclusion in Valle that the plaintiff there had not shown a "substantial likelihood of success on the merits" after an evidentiary hearing on his claim that Florida's administration of lethal injections violated the Eighth Amendment has no bearing on the factual question of whether a substantial change has occurred in Alabama's implementation of its execution procedures. 655 F.3d at 1225.

challenges to Alabama's administration of lethal injections, however, Arthur's complaint and supporting affidavits are sufficiently different from the complaint filed in both cases to survive dismissal at the pleadings stage. In particular, Arthur's complaint is supported by the affidavits of two expert witnesses who had reviewed the testimony of Alabama's expert witness and were prepared to rebut that testimony. Both experts were prepared to testify about specific defects in Alabama's administration of its execution protocol, including deficiencies and irregularities in Alabama's procedure to determine whether an inmate is conscious before injecting the second chemical in its three-drug execution procedure. Moreover, at least one of these experts is prepared to present his conclusions drawn from reviewing eyewitness accounts of the execution of Eddie Powell. Because Eddie Powell and Jason Williams were the first Alabama inmates to be executed using pentobarbital instead of sodium thiopental, Arthur's complaint marks the first time that an Alabama death-row inmate has been able to challenge Alabama's lethal injection procedure using evidence of how pentobarbital is actually administered in Alabama. In contrast, the plaintiff's expert in both Powell and Powell (Williams) was unable to rely on any evidence of how Alabama actually administers its execution protocol; in fact, the expert's testimony in both of those cases was drawn from observations of executions conducted in Oklahoma

9

rather than in Alabama, and contained no criticism or objection to the manner in which Alabama administers lethal injections or to any expert testimony set out by Alabama in defense of its executions.[5]

These significant differences between the factual allegations and supporting affidavits in this case, which we must assume to be true at the motion to dismiss stage, render Arthur's case distinct from the facts and circumstances addressed in our previous decisions. See Anders, 346 F.3d at 1031. Accordingly, the district court committed reversible error in dismissing Arthur's Eighth Amendment claim without any opportunity for factual development, including discovery between the parties.

**B. Equal Protection Violation**

Arthur next alleges that Alabama's material deviation from its lethal injection protocol, namely that it did not conduct the pinch test for consciousness

_____

[5] Alabama claims that a footnote in the district court's opinion referring to Arthur's eyewitness and expert affidavits are sufficient to provide the factual development that we have relied upon in our previous cases. However, Alabama's contention is meritless because none of the district court's remarks in the footnote come close to resembling a finding of fact about, for example, the credibility of Arthur's witnesses to the Powell execution, or the persuasiveness of the analysis presented by Arthur's experts in contrast to the analysis presented by Alabama. Nor does the footnote make any findings as to whether, as both of Arthur's experts describe in their reports, and as one of Arthur's supportive eyewitness affidavits testifies, the individuals conducting the execution failed to administer a "pinch test" in order to determine whether Eddie Powell was insensate before injecting the second and third drugs. Thus, we cannot agree with Alabama's contention that this footnote provides sufficient factual development to stand in lieu of discovery and a hearing on Arthur's evidence.

10

in the execution of Eddie Powell, violates his right to Equal Protection under the Fourteenth Amendment, by burdening his right to be free from cruel and unusual punishment. The district court dismissed this claim as too speculative.

To state an Equal Protection claim, Arthur first has to "show that the State will treat him disparately from other similarly situated persons," DeYoung, 646 F.3d at 1327. Second, "[i]f a law treats individuals differently on the basis of . . . [a] suspect classification, or if the law impinges on a fundamental right, it is subject to strict scrutiny." Leib v. Hillsborough County Pub. Transp. Comm'n, 558 F.3d 1301, 1306 (11th Cir. 2009). Otherwise, Arthur must "must show that the disparate treatment is not rationally related to a legitimate government interest." DeYoung, 646 F.3d at 1327-28.

To survive a motion to dismiss, Arthur has to plead "only enough facts to state a claim to relief that is plausible on its face." Bell Atlantic v. Twombly, 550 U.S. 554, 570 (2007). Here, Arthur has alleged enough facts to constitute a plausible Equal Protection claim because he alleges that Alabama has substantially deviated from its execution protocol in a manner that significantly reduces inmate safeguards. He alleges that Alabama's lethal injection protocol requires pinching

11

the inmate as the last consciousness check[6] after the initial injection of pentobarbital and prior to injecting the final two lethal drugs.  The consciousness check is performed to reduce or eliminate the risk of excruciating pain that would follow the injection of the second and third drugs in the lethal injection protocol.  Arthur alleges that based on eyewitness testimony, the State of Alabama failed to perform the pinch test during the 2011 execution of Eddie Powell, even though Powell's eyes remained open, his head turned from side to side, and he clenched his jaws.

Arthur alleges that Alabama's reduction in safeguards burdens his right to be free from cruel and unusual punishment.  "[S]ubjecting individuals to a risk of future harm—not simply actually inflicting pain—can qualify as cruel and unusual punishment."  Baze v. Rees, 553 U.S. 35, 49 (2008).  Significant deviations from a protocol that protects inmates from cruel and unusual punishment can violate the Eighth Amendment.  Indeed, the Sixth Circuit recently affirmed an order to stay an execution because four core deviations from Ohio's lethal injection protocol, including foregoing mandated vein assessments, burdened the Equal Protection rights of inmates in Ohio.  See In re Ohio Execution Protocol Litigation,  No.

---

[6] As alleged, Alabama assesses an inmate's consciousness through graded stimuli, first calling the inmate's name, then stroking the inmate's eyelids and finally pinching the inmate's arm.

12

12–3035 (6th Cir. Jan. 13, 2012), affirming, <u>Cooey v. Kasich</u>, 801 F. Supp. 2d

623, 643-644 (S.D. Ohio 2011) ("We agree with the district court that the State

should do what it agreed to do: in other words it should adhere to the execution

protocol it adopted.").

Here, Arthur alleges that Alabama failed to perform a required

consciousness check in a recent execution, a significant deviation from its

execution protocol. In light of Arthur's other allegations regarding the veil of

secrecy that surrounds Alabama's execution protocol, it is certainly not

speculative and indeed plausible that Alabama will disparately treat Arthur

because the protocol is not certain and could be unexpectedly changed for his

execution.[7]

Accordingly, accepting Arthur's allegations as we must at the motion to

dismiss stage, we conclude that the district court erred in dismissing Arthur's

Equal Protection claim at this stage of the proceedings and remand for further

factual development.[8]

---

[7] Arthur argues that it is necessary for his Equal Protection and Due Process claims that Alabama make available a copy of its written execution protocol. We leave it to the district court to determine if production of Alabama's written execution protocol is necessary to resolve Arthur's claims.

[8] In order to give the district court the opportunity to conduct any additional proceedings prior to Arthur's presently scheduled execution date of March 29, 2012, we are returning jurisdiction of this matter to the district court forthwith with instructions to conduct any

REVERSED and REMANDED WITH INSTRUCTIONS.

---

additional proceedings, including an evidentiary hearing, as the district court deems necessary.

HULL, Circuit Judge, dissenting:

I respectfully dissent because the majority opinion fails to follow our binding precedent about the substitution of the first drug pentobarbital for sodium thiopental in Alabama's three-drug lethal injection protocol. Based on this circuit's binding precedent, as outlined below, the district court concluded that (1) Arthur's § 1983 claims based on the Eighth Amendment and Due Process were barred by the statute of limitations because the April 2011 substitution of pentobarbital for sodium thiopental is not a significant alteration in the 2002 lethal injection protocol so as to restart the statute of limitations clock, and (2) Arthur's Equal Protection claim failed to state a claim.

For the reasons that follow, I would affirm the district court's dismissal of the plaintiff's complaint. I recount in detail the nature of Arthur's § 1983 claims about pentobarbital and compare them with our § 1983 precedent holding not once but three times that the substitution of pentobarbital does not restart the statute of limitations clock. This comparison shows that Arthur makes the same pentobarbital claims as other inmates have before and our precedent controls Arthur's claims and requires dismissal.

## I.  PROCEDURAL HISTORY

This is Arthur's fifth § 1983 civil action since he was sentenced to death in 1992, and his third such § 1983 challenge to lethal injection as his method of

execution. I review his two earlier § 1983 method-of-execution challenges and then this one.

## A. Arthur's Prior § 1983 Challenges to Lethal Injection Protocol

On May 14, 2007, twenty-seven days after the State filed a motion to set Arthur's execution date, Arthur filed a § 1983 action alleging that "Alabama's three-drug lethal injection protocol . . . violat[ed] the Eighth Amendment's prohibition against cruel and unusual punishment" and seeking injunctive relief "to prevent Alabama's use of the lethal injection procedure." Arthur v. Allen, No. 07-13929, 248 F. App'x. 128, 130 (11th Cir. Sept. 17, 2007) (unpublished). The district court granted the State's motion to dismiss the case based on laches. Id. at 129. This Court affirmed, concluding that the district court did not abuse its discretion in determining that Arthur had unnecessarily delayed filing his challenge to Alabama's lethal injection procedure, given that Arthur was on notice since at least mid-2006 that a § 1983 challenge to Alabama's method of execution was available. Id. at 131-32.

On October 9, 2007, Arthur filed a second § 1983 challenge to Alabama's lethal injection protocol, which the district court again dismissed for unreasonable delay. See Arthur v. Ala. Dep't of Corr., No. 07-15877, 285 F. App'x. 705, 705 (11th Cir. July 29, 2008) (unpublished). On appeal, Arthur argued that his second

16

method-of-execution challenge was distinguishable from his first because Alabama had made material changes to its lethal injection protocol in October 2007. Id. This Court rejected that argument and affirmed the dismissal of Arthur's second § 1983 challenge to Alabama's lethal injection protocol, noting "that it does not appear that Alabama's 26 October 2007 minimal changes to its execution protocol materially changed the procedures that were adopted in 2002." Id.[1] We concluded that "Arthur's challenge that Alabama's revised execution protocol constitutes cruel and unusual punishment is the same challenge that he raised [before]," and thus the district court "did not abuse its discretion in dismissing for unreasonable delay." Id.

## B. Arthur's Present § 1983 Complaint

On April 26, 2011, the Alabama Department of Corrections ("ADOC") amended its lethal injection protocol to substitute the administration of pentobarbital for sodium thiopental as the first drug in the three-drug protocol. On June 8, 2011, Arthur filed the present § 1983 action.[2] Arthur's complaint, as

---

[1]In 2007, Alabama's protocol was modified to add an additional procedural safeguard, namely, a consciousness assessment after the administration of the first drug. See Arthur v. Allen, 2007 WL 4105113 (S.D. Ala. 2007).

[2]Arthur's two previous § 1983 challenges to the lethal injection protocol were filed in the United States District Court for the Southern District of Alabama. The present case was filed in the United States District Court for the Middle District of Alabama.

17

amended, raised three § 1983 claims: (1) Eighth Amendment: the ADOC's use of pentobarbital as the first drug in its three-drug lethal injection protocol violates the Eighth Amendment's ban on cruel and unusual punishment; (2) Due Process: the ADOC's secrecy in adopting and revising its lethal injection protocol violates the Fourteenth Amendment's Due Process Clause; and (3) Equal Protection: the ADOC has materially deviated from its lethal injection protocol (as shown by evidence that witnesses to the State's recent execution of Eddie Powell did not observe officials pinch Powell's arm before administration of the second drug), thereby violating Arthur's rights under the Fourteenth Amendment's Equal Protection Clause.[3]

## C.    Three Expert Declarations and 23 Other Exhibits Attached to Arthur's Complaint

Arthur attached to his complaint not only the declarations of three expert witnesses, but also voluminous documentary evidence. Arthur references these declarations and exhibits repeatedly as part of his complaint and asks this Court to consider them as part of his pleaded allegations in his complaint. See Griffin Industries, Inc. v. Irvin, 496 F.3d 1189, 1205 (11th Cir. 2007) (considering

---

[3]Arthur's complaint also contained a state-law claim that Alabama's lethal injection statute violates the Alabama Constitution's doctrine of separation of powers. Because it dismissed the federal § 1983 claims, the district court declined to exercise supplemental jurisdiction over this state law claim.

exhibits attached to complaint for purposes of motion to dismiss because exhibits "are part of the pleading for all purposes" (quotation marks omitted)); Bickley v. Caremark RX, Inc., 461 F.3d 1325, 1329 n.7 (11th Cir. 2006) (construing documents attached to complaint as part of complaint for purposes of motion to dismiss); Solis-Ramirez v. U.S. Dep't of Justice, 758 F.2d 1426, 1430 (11th Cir. 1985) (rejecting claim that district court improperly considered report attached to complaint on motion to dismiss because "the report that appellant claims was improperly considered was attached to the complaint" and "such attachments are considered part of the pleadings for all purposes, including a Rule 12(b)(6) motion"); see also Brooks v. Blue Cross & Blue Shield of Fla., Inc., 116 F.3d 1364, 1369 (11th Cir. 1997) ("[W]here the plaintiff refers to certain documents in the complaint and those documents are central to the plaintiff's claim, then the Court may consider the documents part of the pleading for purposes of Rule 12(b)(6) dismissal, and the defendant's attaching such documents to the motion to dismiss will not require conversion of the motion into a motion for summary judgment."). Accordingly, Arthur has already presented voluminous evidence which is considered for purposes of the motion to dismiss.

Anesthesiologist Dr. David Lubarsky's declaration (attached to Arthur's complaint) first describes Alabama's protocol: Alabama's lethal injection protocol

19

calls for the serial injection of 2,500 mg of pentobarbital (which, like sodium thiopental, is intended to render the inmate unconscious and insensate), then 50 mg of pancuronium bromide (which paralyzes voluntary muscles), and then 120 mEq of potassium chloride (which stops the heart). Dr. Lubarsky states that <u>if</u> the first drug (now pentobarbital) fails to establish and maintain loss of consciousness and sensation, the inmate will suffer excruciating pain, which will be masked by the paralytic pancuronium bromide. Notably, Dr. Lubarsky never states that 2,500 mg of pentobarbital will <u>not</u> cause unconsciousness in humans. Rather, Dr. Lubarsky focuses on the lack of data about large doses of pentobarbital in humans. Dr. Lubarsky states: (1) pentobarbital "is designed to produce sedation, not anesthesia," it "is not approved by the FDA as an anesthesia induction agent," and "there is no scientific literature establishing the anesthetic dose of pentobarbital";[4] (2) pentobarbital does have "an off-label use . . . for induction of barbiturate coma in severe brain injury patients, [but] this use involves slow administration of the drug over several hours"; (3) "[p]entobarbital acts much more slowly as a sedative than sodium thiopental works as an anesthetic"; (4) "[s]odium thiopental can

_____

[4]Dr. Lubarsky's declaration states that pentobarbital is used for animal euthanasia. In animal euthanasia, pentobarbital is typically administered in a dosage of "up to 100mg . . . per kilogram of body weight in a variety of species," which would equate to 7,500 mg for an animal of about 165 pounds. In animal euthanasia, pentobarbital is used alone to cause death, not simply to render the animal unconscious and insensate before administration of other drugs.

achieve its maximum effect within sixty seconds," whereas "[t]he comparable figure for pentobarbital is fifteen to sixty minutes" for maximum effect;[5] (5) "[t]here is no data at all about the onset time of large boluses (doses of a drug given intravenously) of pentobarbital in humans"; (6) "[p]entobarbital has been tested in humans only at doses much lower than the one specified in Alabama's lethal injection protocol, and administered slowly"; (7) "[t]here is no data in humans at all about the impact of large doses [of pentobarbital] and acute tolerance"; (8) the package insert for pentobarbital states, "There is no average intravenous dose of [pentobarbital] that can be relied on to produce similar effects in different patients" and, based on that insert, a 2,500 mg dose "is insufficient to assure that an inmate is unconscious when given pancuronium bromide and potassium chloride."

The essence of Dr. Lubarsky's testimony is that he does not know what levels of pentobarbital will anesthetize humans because he has never used it on humans and there is no study telling him. The most he can say is he believes that 2,500 mg is insufficient "to assure" or guarantee unconsciousness. In any event,

_____

[5]Dr. Lubarsky does not define or explain "maximum effect." Importantly, Dr. Lubarsky never opines that it would take fifteen to sixty minutes to render an inmate unconscious if pentobarbital was used. The amount of time it takes for pentobarbital to reach "maximum effect" is not the issue. Rather, the issue is only whether pentobarbital (such as in the 2,500 mg dose here) will timely cause an inmate to reach unconsciousness before administration of the second drug.

Dr. Lubarsky never refutes the statement in the affidavit from Dr. Dershwitz (also submitted by Arthur and attached to Arthur's complaint) that 2,500 mg of pentobarbital causes unconsciousness and lack of sensation.

Anesthesiologist Dr. Mark Heath's declaration (also attached to Arthur's complaint) has a similar focus on the lack of data and knowledge about the length of time for pentobarbital to induce unconsciousness. Dr. Heath states: (1) "[t]he chemical properties of pentobarbital strongly suggest that it would produce a more gradual and prolonged transition from consciousness to unconsciousness than would thiopental"; (2) Dr. Heath was "unaware of a single instance of the use of pentobarbital in the clinical setting to induce anesthesia or unconsciousness in a conscious person"; (3) there is "no body of clinical knowledge regarding the behavior of pentobarbital and its effects on human beings when rapidly administered in high dosages to a conscious person"; (4) "[t]he switch to pentobarbital, for which there is no clinical knowledge regarding its effects on human beings when rapidly administered in high dosages to a conscious person, combined with the use of pancuronium bromide and potassium chloride, confers a substantial risk of an excruciating and agonizing death process"; (5) pentobarbital "is classified as an intermediate-acting barbiturate," whereas sodium thiopental "is classified as an ultrashort-acting and/or ultrafast-acting barbiturate"; and (6) "by

22

dint of its being in a different class of barbiturates, pentobarbital would be slower in producing sedation and unconsciousness than would thiopental." Dr. Heath opined that, based on witness accounts of the executions of Eddie Powell and Roy Blankenship, "the pentobarbital did not produce . . . rapid and smooth transition from consciousness to unconsciousness," though Dr. Heath was "not able to identify the cause of the unexpected effects of pentobarbital" in those executions. Yet, like Dr. Lubarsky, Dr. Heath never states that a 2,500 mg dose of pentobarbital does not cause unconsciousness in humans. Dr. Heath, like Dr. Lubarsky, also never states how long a 2,500 mg dose will take to cause loss of consciousness.

Significantly, Arthur's complaint also attached and repeatedly referenced the expert report of anesthesiologist and pharmacologist Dr. Mark Dershwitz.[6] Dr. Dershwitz is familiar with pentobarbital as an anesthetic and expressly opines that pentobarbital, when administered to a human, will induce and cause an adequate depth of anesthesia and loss of consciousness. Dr. Dershwitz's report stated: (1) pentobarbital "is classified as an intermediate-acting barbiturate"; (2) pentobarbital is commonly used for general anesthesia in laboratory animals; (3)

_____

[6]Dr. Dershwitz has both an M.D. and a Ph.D. in pharmacology. The State filed Dr. Dershwitz's report in another inmate's case, but Arthur has now filed it in this case as part of the allegations in his complaint.

23

pentobarbital "is not used for general anesthesia in humans because its duration is considered too long for this purpose," since in almost all clinical anesthesia cases, "the goal is to have the patient awaken quickly and recover promptly following completion of the surgical procedure" and the "duration of pentobarbital, when administered in doses sufficient to cause unconsciousness, is too long to achieve these goals"; (4) pentobarbital is used clinically to induce and maintain a barbiturate coma following brain injury, and for this purpose in an average 80 kg (about 175 lb) adult would be 800 mg given over 30 minutes, then a continual infusion of about 400 mg every three hours; (5) pentobarbital, when used for barbiturate coma, results in the cessation of breathing, so the patient is mechanically ventilated; (6) for barbiturate coma induction and maintenance in an 80 kg adult, "it would take about 5 – 10 hr to achieve the administration of 2,500 mg of pentobarbital," since the 800 mg/400 mg per 3 hr dosage is enough to sustain the coma and "more rapid administration of pentobarbital causes severe and dangerous decreases in blood pressure that might be fatal to the patient"; (7) the 2,500 mg dose of pentobarbital in Alabama's lethal injection protocol is "far in excess of that used to induce and maintain barbiturate coma . . . [and causes] a depth of anesthesia far greater than that needed for any surgical procedure," and thus "once 2,500 mg of pentobarbital have been administered intravenously to an

24

inmate, there is an exceedingly small risk that the inmate could experience the effects of the subsequently administered pancuronium bromide or potassium chloride"; (8) a 2,500 mg dose of pentobarbital "will cause virtually all persons to stop breathing" and "will cause the blood pressure to decrease to such a degree that perfusion of blood to organs will cease or decline such that it is inadequate to sustain life"; (9) "virtually every person given 2,500 mg of pentobarbital will have stopped breathing prior to the administration of pancuronium bromide" and thus, even in the absence of the other two drugs, "the administration of 2,500 mg of pentobarbital by itself would cause death to almost everyone"; and (10) "[p]entobarbital is the most common agent used for physician-assisted suicide in those jurisdictions where the practice is legal."

Arthur also attached to his complaint several newspaper accounts and witness affidavits of the execution of Alabama inmate Eddie Powell. Together these accounts indicate that after the chaplain stopped praying and after the administration of pentobarbital began, Powell raised his neck and head off the gurney, opened his eyes and looked confused, clenched his teeth and flexed his neck muscles. But then, by all accounts, Powell laid his head back down and did not move again.

In fact, according to the affidavit of Powell's own attorney, Christine

25

Freeman (attached to Arthur's complaint), after Powell laid his head back down, a corrections officer called Powell's name and touched Powell's face, then stepped back against the wall of the room, after which the observers "all remained seated, for quite a while longer." The affidavit of Matt Schulz, Powell's other attorney (also attached to Arthur's complaint), states that: "A few minutes after Mr. Powell's head had gone back down, a guard approached Mr. Powell, and called out loudly to him: 'Eddie. Eddie. Eddie.' Mr. Powell made no response. The guard then ran his finger lightly over Mr. Powell's left eyelash. Again, there was no response."[7]

Also attached to Arthur's complaint is an Associated Press newspaper article by Greg Bluestein about the Georgia execution (using pentobarbital) of Roy Blankenship. The Bluestein article stated, among other things, that "Blankenship

---

[7]While I focus on the affidavits filed as part of Arthur's complaint, I note that the State also filed affidavits. Arthur never moved to strike any of the State's affidavits. The witness affidavit of Anne Hill, the ADOC's General Counsel, confirmed that an execution team member "conducted a consciousness assessment using graded stimulation—saying Powell's name, stroking his eyelashes and pinching the back of his left arm." Powell did not respond to any stimuli performed during the consciousness check. Hill states that she sat in the Commissioner's viewing room directly in front of Powell and "could see very well everything occurring in the execution chamber, prior to and during the execution." In another affidavit, Warden Patterson states that the three types of consciousness checks were done, Powell's execution took place in compliance with Alabama's lethal injection protocol, and Warden Patterson observed no deviation whatsoever.

Although I recount the State's affidavits, I do not rely on any of the State's evidence for my analysis of the correctness of the district court's Rule 12(b)(6) dismissal of Arthur's complaint. And, as noted, Arthur's affidavits agree that Powell had stopped moving by the time the two consciousness checks were performed and Powell did not respond to them.

26

jerked his head several times, mumbled inaudibly and appeared to gasp for breath for several minutes after he was pumped with pentobarbital." By all accounts, Blankenship then "became still and was unconscious before the second drug was administered." DeYoung v. Owens, 646 F.3d 1319, 1325–26 (11th Cir. 2011).

## D.    Dismissal of Arthur's Complaint

On August 15, 2011, the State moved to dismiss Arthur's complaint or, alternatively, for summary judgment.[8] The State argued, inter alia, that Arthur's complaint was barred by the statute of limitations and failed to state a claim upon which relief could be granted.

On November 3, 2011, the district court issued an order granting the State's motion to dismiss. The district court concluded that Arthur's Eighth Amendment and Due Process claims were barred by the statute of limitations. The district court explained that: (1) a two-year statute of limitations governed Arthur's

---

[8]The State attached evidentiary materials to its motion, including a deposition transcript from Dr. Dershwitz and affidavits from other witnesses to Powell's execution that stated that the full consciousness check was performed and Powell never appeared to be in pain.

The district court did not rule on the State's alternative summary judgment motion and did not consider its attached evidentiary materials. I need not rely on any of the State's evidence because, as this is an appeal from the grant of a Rule 12(b)(6) motion to dismiss, I focus on Arthur's complaint and the attachments thereto.

In any event, as discussed later, this Court has rejected claims that the evidence of the Powell execution shows an Eighth Amendment violation given that Powell was unconscious before the second drug was administered. See DeYoung v. Owens, 646 F.3d 1319, 1327 n.5 (11th Cir. 2011); see also Valle v. Singer, 655 F.3d 1223, 1232-33 & n.9 (11th Cir. 2011).

§ 1983 claims; (2) a method-of-execution claim accrues on the later of the date the inmate's state review is complete or the date on which the inmate becomes subject to a new or substantially changed execution protocol; (3) Arthur's claim accrued on July 31, 2002, when Alabama adopted lethal injection as its method of execution; (4) Eleventh Circuit precedent foreclosed Arthur's arguments that the switch from sodium thiopental to pentobarbital resulted in a new or substantially changed execution protocol; (5) Eleventh Circuit precedent also established that Arthur's Due Process claim about the secrecy of Alabama's protocol accrued on July 31, 2002; and (6) thus, Arthur brought his Eighth Amendment and Due Process claims nearly seven years after the limitations period expired.

The district court dismissed Arthur's Equal Protection claim as to the ADOC's alleged failure to conduct a full consciousness check during the Powell execution for failure to state a claim. The district court reasoned that, even "[a]ssuming that observation of the 'pinch test' is constitutionally significant, Arthur's allegation, that ADOC's protocol was not followed in one execution, does not raise his right to relief above a speculative level."

Arthur appealed.[9]

---

[9]This Court reviews <u>de novo</u> a district court's order granting a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). <u>Bhd. of Locomotive Eng'rs & Trainmen Gen. Comm. of Adjustment CSX Transp. N. Lines v. CSX Transp., Inc.</u>, 522 F.3d 1190, 1194 (11th Cir.

## II.  OUR PRECEDENT

This is not the first time this Court has been called upon to decide a § 1983 challenge to Alabama's use of pentobarbital as the first drug in its three-drug execution protocol.  See Powell v. Thomas, 641 F.3d 1255 (11th Cir. May 19, 2011) ("Powell (Williams)"); Powell v. Thomas, 643 F.3d 1300 (11th Cir. June 15, 2011) ("Powell").[10]  We have also decided similar § 1983 challenges to Georgia's and Florida's contemporaneous decisions to use pentobarbital as the first execution drug.  See DeYoung, 646 F.3d 1319 (11th Cir. July 20, 2011); Valle v. Singer, 655 F.3d 1223 (11th Cir. Sept. 7, 2011).  I discuss these prior cases in detail below in order to show how Arthur's very claims about pentobarbital—both factually and legally—were already rejected in these cases.

## A.    **Powell (Williams)**

Alabama announced its switch from sodium thiopental to pentobarbital a

---

2008).  "We accept the allegations in the complaint as true and construe them in favor of the plaintiff."  Id.  "A Rule 12(b)(6) dismissal on statute of limitations grounds is appropriate only if it is apparent from the face of the complaint that the claim is time-barred."  Id. (quotation marks omitted).  To state a claim for relief, a complaint must contain factual allegations that, if true, would "raise a right to relief above the speculative level." Speaker v. U.S. Dep't of Health & Human Servs. Ctrs. for Disease Control & Prevention, 623 F.3d 1371, 1380 (11th Cir. 2010) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 1964-65 (2007)).

[10]Powell (Williams) dealt with the claims of Alabama death row inmate Jason Williams, who was permitted to intervene in a § 1983 case brought by fellow Alabama death row inmate Eddie Powell.  Powell was the separate appeal by Powell himself from the same district court case.

few weeks before Williams's scheduled execution date. <u>Powell (Williams)</u>, 641 F.3d at 1256. Williams moved to intervene in Powell's ongoing § 1983 action and moved the district court for a stay of execution. <u>Id.</u> Williams alleged, among other things, "that the ADOC's protocol change will result in a violation of [Williams's] Eighth Amendment right to be free from cruel and unusual punishment." <u>Id.</u> The district court granted Williams's motion to intervene.

Williams's complaint alleged: (1) "the drug that ADOC now intends to use as the first drug in the [lethal injection] sequence, pentobarbital, is not an ultra short acting barbiturate like sodium thiopental"; (2) "[p]entobarbital is not an agent used medically to induce loss of consciousness and loss of sensation because of <u>the extended length of time it takes for the drug to act</u>"; (3) "[p]entobarbital is less lipid soluble than sodium thiopental, decreasing the rate of penetration into the brain, causing <u>the slower onset of anesthesia after intravenous injection</u>"; (4) "[w]hile pentobarbital is used to create a state of sedation[,] sedation is not the same as a loss of consciousness and loss of sensation. Sedated individuals can be aware and can feel pain"; (5) "[i]f pentobarbital is ineffectively administered and fails to establish and maintain loss of consciousness and loss of sensation, [the second drug] pancuronium bromide serves only to mask the inmate's pain and suffering from observers, but does not prevent the inmate from suffering a painful

30

death by asphyxiation"; (6) "[a]bsent complete anesthesia, the injection of [third drug] potassium chloride causes excruciating pain"; (7) "there is no standard clinical dose of pentobarbital used to induce anesthesia" because "pentobarbital is not even used medically to induce [un]consciousness and loss of sensation"; and (8) "the use of a drug not approved to induce anesthesia creates a substantial risk of serious harm to Mr. Williams." (Emphasis added.)

In Powell (Williams), the district court outlined Alabama's protocol as having these steps—which are the same steps outlined in Dr. Lubarsky's declaration filed by Arthur himself:

> The protocol calls for the administration of three drugs in a specific sequence, beginning with either sodium thiopental, or in case of its unavailability, pentobarbitol, with an initial injection of 2.5 grams. A team member physically assesses the consciousness of the inmate after the initial injection, by applying graded stimulation. . . . After the inmate is documented to be unconscious, the second and third drugs are administered.

Powell v. Thomas, 784 F. Supp. 2d 1270, 1277 (M.D. Ala. 2011) (footnotes omitted).

The district court also reviewed the parties' evidence, including "(1) an expert report, introduced by Williams, challenging the use of pentobarbital in Oklahoma executions, and (2) an expert report, submitted by the State, asserting that the use of pentobarbital in the Alabama lethal injection protocol presents 'an

31

exceedingly small risk that a condemned inmate . . . would experience any pain or suffering associated with the administration of lethal doses of pancuronium bromide and potassium chloride.'" Powell (Williams), 641 F.3d at 1257 (ellipsis in original). This second expert report at issue in Powell (Williams) is by Dr. Dershwitz, whose report Arthur actually filed and attached to his complaint. The district court credited the Dr. Dershwitz's expert report and denied Williams's motion for a stay, concluding that Williams had not demonstrated a substantial likelihood of success on the merits of his Eighth Amendment claim. Id.

Williams appealed to this Court, arguing that the district court abused its discretion in denying his motion for a stay of execution. Id. at 1256-57. This Court reviewed the parties' evidence and found that "[t]he evidence present[ed] does not demonstrate that the ADOC's use of pentobarbital creates [a] substantial risk of serious harm to Williams." Id. at 1257. Thus, this Court concluded, "We are unable to determine that the district court abused its discretion by crediting the expert report submitted by the State and concluding that Williams has not demonstrated a substantial likelihood of success on the merits of this Eighth Amendment claim." Id. Here, because Arthur attaches Dr. Dershwitz's report to his complaint, we must accept it as true for purposes of the State's motion to dismiss, obviating any need for fact-finding or crediting by the district court.

32

Williams also alleged on appeal that he had "a broad Eighth Amendment right to know the details of his execution." Id. at 1258. This Court rejected that argument, specifically holding that "[t]he replacement of sodium thiopental with pentobarbital does not constitute a significant alteration in the ADOC's lethal injection protocol":

> In attempting to avoid the legal prism typically used for analyzing similar Eighth Amendment claims, Williams asserts that he has a broad Eighth Amendment right to know the details of his execution in order to ensure proper oversight and avoid uncertainty that unnecessarily creates anxiety, which greatly exacerbates his sentence. Williams focuses on Nelson v. Campbell, 541 U.S. 637, 124 S.Ct. 2117, 158 L.Ed.2d 924 (2004), In re Medley, 134 U.S. 160, 10 S.Ct. 384, 33 L.Ed. 835 (1890), and Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), and he argues that these cases establish an Eighth Amendment right to know the details surrounding his execution.
>
> In Nelson, the ADOC altered its lethal injection protocol—approximately one week before defendant's execution—to allow for a "cut-down" procedure. This involved making a two-inch incision in the defendant's arm or leg and catheterizing a vein one hour before the execution with only local anesthetic. The state proposed the "cut down" procedure because standard techniques for gaining intravenous access were unavailable because of the defendant's past drug use. The holding of Nelson, however, is "extremely limited." The Court simply concluded that 42 U.S.C. § 1983 was "an appropriate vehicle for petitioner's Eighth Amendment claim seeking a temporary stay" based on altered execution protocols that could violate a defendant's civil rights. It remanded the case for further proceedings to determine the merits of the defendant's Eighth Amendment claim.
>
> In Medley, the Court, analyzing an ex post facto claim, concluded that a new Colorado statute imposed a greater penalty than its predecessor because the new law prohibited the warden from disclosing the execution date to the defendant, while the previous statute required

33

a court to inform the defendant of his execution date. Ultimately, the Court concluded that the "secrecy" surrounding an execution under the new statute "must be accompanied by an immense mental anxiety amounting to a great increase of the offender's punishment," and, therefore, the statute in question violated the Constitution's ex post facto clause. See also Gregg, 428 U.S. at 173, 96 S.Ct. 2909 (prohibiting the "unnecessary and wanton infliction of pain").

We decline to read these cases as establishing a categorical rule entitling defendants to a lethal injection protocol that is legislatively enacted and subjected to extensive litigation. After an in camera review, the district court found that the State's representations regarding the amended execution protocol were accurate and adequately informed Williams of the process that would be used. The replacement of sodium thiopental with pentobarbital does not constitute a significant alteration in the ADOC's lethal injection protocol, and we conclude that such an amendment does not violate the Eighth Amendment under the cases cited by Williams.

Powell (Williams), 641 F.3d at 1257-58 (citations omitted; emphasis added). The

Court affirmed the district court's denial of Williams's motion to stay his

execution.

B.    Powell

Powell filed his § 1983 action about a month before his scheduled execution

date.[11]  Powell, 643 F.3d at 1301-02.  Powell's complaint alleged that the ADOC's

"change from sodium thiopental to pentobarbital as the first of three drugs used in

_____

[11]On April 15, 2011, the Alabama Supreme Court set Powell's execution for June 16, 2011.  Powell, 643 F.3d at 1302.  On April 26, 2011, the ADOC announced it was changing the first drug in its execution protocol from sodium thiopental to pentobarbital.  On May 13, 2011, Powell filed his § 1983 action. Id.  Also on May 13, 2011, Williams moved to intervene in Powell's action to pursue his "nearly identical" claims.  Id.

the lethal injection protocol constitutes cruel and unusual punishment in violation of the Eighth Amendment and violates [Powell's] rights protected by the Due Process Clause." Id. at 1302. Powell's complaint further alleged: (1) "the drug that the Defendants and ADOC now intend to use as the first drug in the [lethal injection] sequence, pentobarbital, is not an ultra short acting barbiturate like sodium thiopental"; (2) "[p]entobarbital is not an agent used medically to induce loss of consciousness and loss of sensation, because of the extended length of time it takes for the drug to act"; (3) "[p]entobarbital is less lipid soluble than sodium thiopental, decreasing the rate of penetration into the brain, causing the slower onset of anesthesia after intravenous injection"; (4) "[w]hile pentobarbital is used to create a state of sedation, sedation is not the same as a loss of consciousness and loss of sensation. Sedated individuals can be aware and can feel pain"; (5) "[i]f pentobarbital is ineffectively administered and fails to establish and maintain loss of consciousness and loss of sensation, [the second drug] pancuronium bromide serves only to mask the inmate's pain and suffering from observers, but does not prevent the inmate from suffering a painful death by asphyxiation"; (6) "[a]bsent complete anesthesia, the injection of [third drug] potassium chloride causes excruciating pain"; (7) "there is no standard clinical dose of pentobarbital used to induce anesthesia" because "[p]entobarbital is not even used medically to induce

35

loss of consciousness and loss of sensation"; and (8) "the use of a drug not approved to reliably induce full anesthesia creates a substantial risk of serious harm to Mr. Powell." (Emphasis added.)

The State moved to dismiss Powell's complaint as barred by the two-year statute of limitations for § 1983 claims. Id. The district court granted the motion to dismiss, concluding that "the statute of limitations for Powell's challenge to execution by lethal injection began running on July 31, 2002, the last time the state made a 'significant change' in the state execution protocol by switching from electrocution to lethal injection, and therefore [the period] expired on July 31, 2004." Id.

On appeal, Powell argued that the district court erred in granting the State's motion to dismiss his § 1983 action as time-barred because (1) the change from sodium thiopental to pentobarbital was a "significant change" in the protocol and thus re-started the limitations period, and the district court's contrary holding "relied on external evidence and dicta"; and (2) Powell's "claim regarding Alabama's secrecy and arbitrary changes also accrued when the ADOC changed the first drug in the protocol." Id. This Court, applying de novo review and accepting the allegations in Powell's complaint as true, affirmed. Id.

This Court first discussed the Powell (Williams) decision we had issued the

36

month before:

> Powell is not the first Alabama death row inmate to bring these constitutional causes of action. A nearly identical complaint was filed by another Alabama death row inmate, Jason Oric Williams. . . .
>
> In Williams's appeal, the Eleventh Circuit first addressed a § 1983 claim identical to Powell's Eighth Amendment claim, recognizing that "to prevail on such a claim there must be a 'substantial risk of serious harm,' an 'objectively intolerable risk of harm' that prevents prison officials from pleading that they were 'subjectively blameless for purposes of the Eighth Amendment.'" We then rejected his claim, squarely holding that "[t]he evidence present does not demonstrate that the ADOC's use of pentobarbital creates substantial risk of serious harm to Williams."
>
> Turning to Williams's notice claim, the Eleventh Circuit . . . noted that in the case before it, "the district court found that the State's representations regarding the amended execution protocol were accurate and adequately informed Williams of the process that would be used." Notably, we concluded: "The replacement of sodium thiopental with pentobarbital <u>does not constitute a significant alteration</u> in the ADOC's lethal injection protocol, and . . . such an amendment does not violate the Eighth Amendment under the cases cited by Williams." (emphasis added).

<u>Powell</u>, 643 F.3d at 1302-03 (citations omitted).  The panel in <u>Powell</u> framed the

issue before it as "whether, in light of our prior precedent in <u>Powell(Williams)</u>,

Powell's claims are still viable."  <u>Id.</u>

The <u>Powell</u> Court concluded that <u>Powell (Williams)</u> controlled and that

"Powell's attempts to circumvent the holding of <u>Powell(Williams)</u> fall flat":

> Powell claims that the basis of his first claim—that the ADOC's lethal injection protocol violates the Eighth Amendment—has undergone a "significant change" . . . because of the recent change in the

37

anesthetic used to ensure that there is no pain during the remaining stages of the procedure. However, this very argument—that the ADOC's change from sodium thiopental to pentobarbital, is a substantial or significant change in the lethal injection protocol—was rejected by a panel of this Court in Powell(Williams), where we held that "[t]he replacement of sodium thiopental with pentobarbital does not constitute a significant alteration in the ADOC's lethal injection protocol." (emphasis added). Indeed, as the Tenth Circuit has recognized, sodium thiopental and pentobarbital are both classified as barbiturates. See Pavatt v. Jones, 627 F.3d 1336, 1337 (10th Cir.2010). They differ in their length of effect; sodium thiopental is "ultrashort-acting," while pentobarbital is "intermediate-acting"—which simply means its effect lasts longer than that of sodium thiopental.

Powell's attempts to circumvent the holding of Powell(Williams) fall flat. As for Powell's claim that Powell(Williams)'s key language is dicta, the Eleventh Circuit panel in that discussion was expressly addressing Williams's claim that he had an Eighth Amendment right to know the details surrounding his execution. Williams had based his claim, in part, on Nelson, 541 U.S. at 639, 124 S.Ct. 2117, where the Supreme Court had concluded "that 42 U.S.C. § 1983 was 'an appropriate vehicle for petitioner's Eighth Amendment claim seeking a temporary stay' based on altered execution protocols that could violate a defendant's civil rights." (emphasis added). Applying Nelson to Williams's claim, the Powell(Williams) panel concluded that "[t]he replacement of sodium thiopental with pentobarbital does not constitute a significant alteration in the ADOC's lethal injection protocol, and ... such an amendment does not violate the Eighth Amendment under the cases cited by Williams." (emphasis added). Accordingly, the Powell(Williams) panel necessarily answered whether the change in lethal injection protocol was a significantly altered one in rejecting Williams's Nelson claim. Its language regarding whether the alteration was significant, therefore, constitutes holding, not dicta. As we've said, dicta is defined as those portions of an opinion that are not necessary to deciding the case then before us, whereas holding is comprised both of the result of the case and those portions of the opinion necessary to that result by which we are bound.

Id. at 1304-05 (citations and quotation marks omitted).

Further, the Powell panel noted that "if the change in protocol is not a 'significant alteration' for purposes of an Eighth Amendment notice claim, we cannot see how it would constitute a significant change for purposes of a statute of limitations' triggering date." Id. at 1305. The Court also rejected the notion that the Powell (Williams) holding should not control because Powell (Williams) was decided on appeal from the denial of a stay of execution (which requires a showing of substantial likelihood of success on the merits, under an abuse of discretion standard), not a motion to dismiss (decided de novo, accepting plaintiff's allegations as true):

> [W]e recognize that Williams's claim in Powell(Williams) was decided on an appeal from the district court's denial of a motion for a temporary stay of execution. However, as the district court noted, no reason has been offered, and none can be envisioned, why Powell(Williams)'s holding would mean something different when analyzing whether a change in execution protocol is significant or substantial in either circumstance. In both cases, the allegations are identical, and the Powell(Williams) Court clearly went to the merits of the issue when ruling on the motion for stay. Thus, not only do we reject Powell's suggestion that the district court erroneously relied on external evidence from Powell(Williams), and went beyond the face of Powell's complaint in deciding this case, but we conclude that the district court did not err in basing its conclusion on our binding precedent in Powell(Williams), which applies here. Furthermore, in light of our binding precedent, we are obliged to reject Powell's attempt to relitigate the issue of whether the ADOC's action in changing the first drug in the lethal injection protocol from sodium thiopental to pentobarbital is a "significant"

change for purposes of [the statute of limitations]. For these reasons, the district court did not err in determining that Powell's claim is barred by the statute of limitations.

Id. at 1305 (emphasis added).

We also affirmed the district court's decision to dismiss as time-barred Powell's claim as to the secrecy of Alabama's execution protocol:

> Nor, moreover, did the district court err in dismissing Powell's second claim—that his rights under the Eighth and Fourteenth Amendments were violated because Alabama's private execution protocol was changed secretly and without any oversight—on statute of limitations grounds. As the district court held, Powell could have challenged the ADOC's "secrecy" surrounding the method of execution beginning July 31, 2002, as the facts supporting this cause of action should have been apparent to any person with a reasonably prudent regard for his rights. Indeed, as Powell acknowledges in his opening brief, "Alabama does not mandate by statute or regulation what drugs are to be used in conducting a lethal injection, and the ADOC may change the drugs used in the protocol at any time for any reason without notice or oversight[,] . . . [and the drug used] is subject to change at any time." Thus, Powell fails to show how his claim about the secrecy surrounding the ADOC's recent change in lethal injection protocol was revived by the ADOC's 2011 switch in drugs. And in any event, this very claim was also rejected by this Court in Powell(Williams), which, as noted above, constitutes binding precedent.

Id. at 1305 (quotation marks and citations omitted). Thus, Arthur's very claims about pentobarbital were rejected in Powell and Powell (Williams). But there is more.

**C.    DeYoung**

40

On May 13, 2011, the Georgia Department of Corrections ("GDOC"), like its Alabama counterpart, switched the first drug in its three-drug lethal injection protocol from sodium thiopental to pentobarbital. DeYoung, 646 F.3d at 1322-23. On July 15, 2011, Georgia death row inmate Andrew DeYoung, who was scheduled to be executed five days later, filed a § 1983 action challenging Georgia's method of execution on Eighth Amendment and Equal Protection grounds. Id. at 1322. Just as Arthur's does here, DeYoung's complaint alleged that the Blankenship and Powell executions showed pentobarbital did not work fast enough. DeYoung even used the affidavits of Powell's same attorneys and the same Bluestein news article as Arthur does here.

Specifically, DeYoung's complaint alleged, inter alia: (1) reporter Greg Bluestein's account of the Blankenship execution, particularly Blankenship's movements during the procedure and his eyes remaining open, demonstrated that "Georgia's first execution with pentobarbital went wrong"; (2) based on the Bluestein account, DeYoung's expert witnesses opined that "Blankenship suffered"; (3) the State's assurances "that pentobarbital works as fast as sodium thiopental and that a person will be unconscious within 'thirty to sixty seconds' after receiving" pentobarbital "proved to be incorrect"; (4) based on the affidavits by Powell's attorneys Freeman and Schulz, Powell also "reacted adversely to

41

pentobarbital"; (5) "[p]entobarbital is not used to anesthetize fully awake humans"; (6) there was not enough data to know "how an overdose of pentobarbital will affect basically healthy inmates"; (7) "pentobarbital has not been sufficiently tested to render an entirely conscious human adult unconscious"; and (8) the State's use of pentobarbital "inflicted pain and needless suffering on Mr. Blankenship" and is "very likely" to do so to DeYoung. (Emphasis added.) DeYoung moved for a stay of execution, and the State of Georgia moved to dismiss the complaint as time-barred and for failure to state a claim upon which relief could be granted. Id.

The district court held an evidentiary hearing, after which it denied DeYoung's motion to stay the execution and granted the State's motion to dismiss. Id. The district court concluded that: (1) the two-year statute of limitations period expired eight years before DeYoung filed his claims because, inter alia, the switch to pentobarbital was not a significant alteration to the execution protocol; and (2) alternatively, DeYoung's complaint failed to state a claim. Id. at 1323. We described DeYoung's claims and the district court's alternative grounds for dismissal as follows:

> DeYoung's challenge to the State's method of execution is two-pronged. First, he contends the GDOC's lethal injection protocol violates the Eighth Amendment's prohibition of cruel and unusual

42

punishment. Specifically, DeYoung alleges, among other things, that the use of pentobarbital as an anesthetic poses a substantial risk of serious harm to him because: (1) <u>pentobarbital has been insufficiently tested for induction of anesthetic coma in fully conscious persons, and (2) in prior executions using pentobarbital, the drug did not painlessly anesthetize the prisoners</u>.

Second, DeYoung contends the GDOC's lethal injection protocol, as written and as administered in practice, violates his right to equal protection under the Fourteenth Amendment because: (1) the written protocol contains gaps in the execution procedure that the GDOC fills in on an <u>ad hoc</u> basis, leading to disparate treatment for different inmates; and (2) the GDOC deviates from the written protocol, similarly leading to disparate treatment for different inmates. . . .

. . .

. . . [T]he district court concluded that DeYoung failed to state a claim upon which relief could be granted. As to the Eighth Amendment claim, the district court found, among other things: (1) DeYoung's evidence failed to show that the administration of pentobarbital inflicts serious harm; (2) DeYoung has not proven that former inmate Roy Blankenship (who on June 23, 2011 was executed by the State of Georgia using pentobarbital as the anesthetic) suffered pain or serious harm; (3) that DeYoung's expert "failed to provide a medical explanation for why pentobarbital might have caused Blankenship pain" and "[t]o the contrary, Dr. Waisel testified that a patient will not feel pain at the moment when a drug is introduced intravenously unless it is a drug, such as potassium chloride, which causes a burning sensation"; (4) DeYoung presented no evidence indicating a 5,000–milligram dose of pentobarbital fails to cause unconsciousness; (5) <u>a consciousness check was performed on Roy Blankenship prior to injection of the second drug pancuronium bromide as required by Georgia's legal injection procedure</u>; and (6) executions in Georgia do not proceed with the second drug until the inmate is unconscious and "DeYoung's execution cannot proceed until he is unconscious." Thus, DeYoung did not show that Georgia's use of pentobarbital creates a substantial risk of serious harm to inmates.

As to DeYoung's Fourteenth Amendment claim, the district court found: (1) there was no support for "DeYoung's novel proposition" that

43

the Equal Protection Clause requires the State to "produce a written protocol that is detailed enough to insure that every execution is precisely identical"; (2) the "deviations" from the written protocol of which DeYoung complains (including the use of nurses to insert IVs, the presence of two nurses instead of one, performance of numerous consciousness checks, and checks for IV infiltration or leakage) are consistent with Georgia's written protocol and "enure to the benefit" of inmates; and (3) the benign "deviations" are rationally related to the State's interest in safeguarding the execution process. Thus, DeYoung did not show an equal protection violation.

DeYoung, 646 F.3d at 1323-24 (brackets omitted) (emphasis added). The district court denied a stay of execution or other injunctive relief because it concluded DeYoung had "absolutely no likelihood of success on the merits." Id. at 1324 (quotation marks omitted).

DeYoung appealed the district court's dismissal of his complaint and denial of his motion for a stay of execution. Id. DeYoung also moved this Court for a stay. Id. We denied DeYoung's stay motion and affirmed. Id. at 1324, 1328. In doing so, we concluded that "DeYoung's claims are barred by the statute of limitations and, even if they were timely, they fail as a matter of law." Id. at 1324.

As to the statute of limitations, this Court concluded that "DeYoung last became subject to a new or substantially changed execution protocol on October 5, 2001," when Georgia switched from electrocution to lethal injection, and thus his limitations period expired nearly eight years before he brought his § 1983 action.

44

Id. at 1325.   The DeYoung panel expressly rejected DeYoung's argument, which

is the same one Arthur makes, that the substitution of pentobarbital for sodium

thiopental was a substantial change, concluding that (1) Powell (Williams) and

Powell were binding authority on that point, and (2) DeYoung's new evidence

about pentobarbital did not change that fact:

> DeYoung argues that Georgia's May 13, 2011 substitution of pentobarbital for sodium thiopental as the anesthetic in its lethal injection protocol resulted in a "substantially changed execution protocol." We already rejected an identical claim as to Alabama's recent switch from sodium thiopental to pentobarbital. See Powell, 2011 WL 2437498, at *2–4 (rejecting Eighth Amendment challenge to method of execution on statute of limitations grounds, stating, "this very argument—that the ADOC's change from sodium thiopental to pentobarbital, is a substantial or significant change in the lethal injection protocol—was rejected by a panel of this Court in Powell (Williams)," and "Powell's attempts to circumvent the holding of Powell (Williams) fall flat"); see also Powell (Williams), 641 F.3d at 1258 ("The replacement of sodium thiopental with pentobarbital does not constitute a significant alteration in the ADOC's lethal injection protocol ...."). DeYoung acknowledges the Powell decision is on point, but argues that the evidence he proffered in this record undermines the premise of Powell. However, "the mere act of proffering additional reasons not expressly considered previously will not open the door to reconsideration of the question by a second panel." Smith v. GTE Corp., 236 F.3d 1292, 1302 (11th Cir.2001) (quotation marks and ellipsis omitted). And in any event, the additional evidence DeYoung proffers does not, for the reasons set forth below, undermine Powell's conclusion.

Id. at 1325 (emphasis added).

The Court, as an alternative holding independent of its statute of limitations

conclusion, then discussed the merits of DeYoung's Eighth Amendment and Fourteenth Amendment claims. Id. at 1325-28. As to the Eighth Amendment claim, DeYoung alleged that evidence from witnesses to Georgia's June 23, 2011 execution of Roy Blankenship supported DeYoung's claims that (1) the administration of 5,000 milligrams of pentobarbital, as Georgia's protocol requires, causes needless suffering, and (2) the pentobarbital did not adequately render an inmate unconscious.[12] Id. at 1325-26.

As part of its alternative merits holding, the Court reviewed the evidence presented in the district court, including the affidavits from witnesses to Blankenship's execution stating that Blankenship moved during the execution and the testimony of DeYoung's expert Dr. Waisel that such movements demonstrated that Blankenship suffered. Id. at 1326-27. This Court noted that (1) although the witness accounts disagreed as to the type and timing of Blankenship's movements, "[t]he evidence undisputedly shows that Blankenship became still and was unconscious before the second drug was administered"; (2) Dr. Waisel provided no medical explanation for why pentobarbital would cause Blankenship pain; (3)

---

[12]DeYoung also claimed that pentobarbital had not been tested sufficiently for its ability to induce an anesthetic coma in humans, but as DeYoung's own expert admitted he did not—and could not—know how pentobarbital could affect inmates because of this lack of testing, the Court held that this contention "obviously cannot satisfy DeYoung's burden of affirmatively showing that a substantial risk of serious harm exists." DeYoung, 646 F.3d at 1326 n.4.

46

"Blankenship's autopsy revealed no evidence of trauma"; and (4) "DeYoung presented no evidence to show that unconsciousness is not achieved after the complete administration of a 5000–mg dose of pentobarbital." Id. DeYoung also submitted evidence that Powell's execution by the State of Alabama showed that pentobarbital created a substantial risk of serious harm, but this Court rejected that claim as well:

> In addition to the evidence concerning the Blankenship execution, DeYoung submitted some evidence regarding the execution of Eddie Powell, who was recently executed in Alabama using a pentobarbital-pancuronium bromide-potassium chloride protocol. DeYoung's evidence about the Powell execution does not change our conclusion. Powell's attorney, who witnessed Powell's execution, testified that about a minute after the Chaplain finished praying with Powell, Powell (1) lifted his head, (2) looked confused, and (3) clenched his teeth and flexed his neck muscles as if he were extremely angry or tense or nervous. After about a minute more, Powell lay back down, closed his eyes, and did not move again. Powell's counsel did not know at what time the various chemical were administered.

Id. at 1327 n.5. The DeYoung panel concluded, "DeYoung has wholly failed to show that pentobarbital, once fully administered and allowed to act, is ineffective as an anesthetic. As the district court succinctly found, Georgia's 'use of pentobarbital does not create a substantial risk of serious harm to inmates.'" Id. at 1327.

This Court also considered, and rejected, DeYoung's equal protection claim,

47

as follows:

> DeYoung's equal protection claim asserts, essentially, that Georgia's written lethal injection protocol is insufficiently specific and thus the GDOC deviates from it on an ad hoc basis, leading to disparate treatment for different inmates. DeYoung has not shown a substantial likelihood of success on the merits of this claim.
>
> First, as the district court correctly noted, there is no support for DeYoung's "novel proposition" that the Equal Protection Clause requires a written execution protocol sufficiently detailed to ensure that every execution is performed in a precisely identical manner. Moreover, our review of the Georgia lethal injection protocol reveals it to be highly detailed as to nearly every aspect of the execution process.
>
> Second, the "deviations" DeYoung cites that lead to the disparate treatment of which he complains [including having one more nurse present, and performing more consciousness checks, than the written protocol requires] are all ways by which the GDOC provides more protection for an inmate and the execution process than the written protocol provides. The State has a legitimate interest in ensuring that its executions occur in a thorough manner with maximum inmate safeguards, and the alleged deviations from the written protocol are rationally related to that interest. DeYoung has not shown a substantial likelihood of success on his equal protection claim.

Id. at 1328.[13]

## D.   Valle

Like Arthur in Alabama, Florida death row inmate Manuel Valle tried to

---

[13]As a result of litigation by another Georgia death row inmate about the use of pentobarbital as the first drug in Georgia's three-drug lethal injection protocol, a Georgia trial court ordered DeYoung's July 20, 2011 execution to be videotaped. Despite the claims raised before DeYoung's execution about the efficacy of pentobarbital and the time it took for pentobarbital to render an inmate unconscious, to date no one has raised any allegations of problems with the DeYoung execution. Arthur relies on the same allegations concerning the Powell and Blankenship executions that were brought before the district court and this Court in DeYoung.

circumvent Eleventh Circuit precedent about the State's substitution of pentobarbital for sodium thiopental in <u>Valle v. Singer</u>, 655 F.3d 1223 (11th Cir. 2011). Valle's complaint alleged: (1) the State's substitution of pentobarbital for sodium thiopental "create[s] a substantial risk of serious harm and undue pain and suffering, particularly from awareness while being paralyzed and receiving potassium chloride"; (2) "[t]he use of pentobarbital as an agent to induce anesthesia is not FDA approved, has no relevant clinical history and has no relevant clinical reference doses on which to determine what dose would cause a clinically adequate depth of anesthesia, much less an adequate lethal injection dose"; (3) "[t]he injection of pancuronium bromide and/ or potassium chloride will cause excruciating pain and suffering if administered to a condemned inmate who is not sufficiently anesthetized"; (4) "[s]odium thiopental is an ultra-short acting barbiturate which acts to depress the central nervous system to produce unconsciousness and anesthesia," whereas "[p]entobarbital is a short-acting barbiturate approved by the Food and Drug Administration (FDA) for the treatment of seizures, preoperative (and other) sedation, an use as a hypnotic"; (5) "[p]entobarbital has not been FDA-approved for the induction of anesthesia, has no relevant clinical history, and has no relevant clinical reference doses by which to determine an appropriate dosage for a clinically adequate depth of anesthesia to

49

avoid the excruciating pain caused by an injection of potassium chloride"; (6) Georgia "botched the execution of Roy Willard Blankenship, its first using pentobarbital"; (7) "Blankenship was inadequately anesthetized and was sentient for approximately the first three minutes of the execution and he suffered greatly"; (8) "[t]here is no way to know, in any given case, how a massive dose of pentobarbital will affect a human patient, because it has not been tested to any remotely sufficient degree to be able to say"; and (9) "[t]here are also serious concerns about the adequacy of monitoring for continuing consciousness of the inmate after injection of pentobarbital, particularly in light of lack of information available about how fast pentobarbital takes effect in a lethal injection scenario." The district court denied Valle's motion for an injunction and a stay of execution, and Valle appealed.

After reviewing our precedent, this Court adopted the district court's opinion, which concluded that: (1) Florida, by substituting pentobarbital as the first drug, did not make a significant alteration in its lethal injection protocol; (2) "Valle's protestations notwithstanding, the purported distinctions upon which he relies are neither new nor, based on Eleventh Circuit precedent, are they sufficient alone or in combination with one another to carry his burden"; (3) Valle's "attempt to distinguish his claim from the binding Powell precedent, based upon the

50

Blankenship execution and the affidavit of Dr. Waisel, is significantly undermined if not entirely foreclosed by DeYoung []"; and (4) Valle "failed to support his assertion that his case is distinguishable from the Eleventh Circuit's decisions in the Powell cases and DeYoung [], and mere speculation cannot substitute for evidence that the use of pentobarbital will or very likely will cause serious illness and needless suffering." 655 F.3d at 1231-33.

With this binding precedent as background, I turn to Arthur's claims on appeal.

### III. ANALYSIS

#### A. Eighth Amendment Claim

Arthur argues the district court erred in dismissing as time-barred his claim that the ADOC's lethal injection protocol violates the Eighth Amendment's ban on cruel and unusual punishment. Arthur does not dispute that his Eighth Amendment claim is untimely unless the ADOC's switch to pentobarbital constitutes a significant or substantial alteration in the execution protocol. See Powell, 643 F.3d at 1303-04 (citing McNair v. Allen, 515 F.3d 1168, 1174, 1177 (11th Cir. 2008)). Nor does he dispute that in Powell (Williams), Powell, DeYoung, and Valle, this Court stated that the substitution of pentobarbital for sodium thiopental "does not constitute a significant alteration." Powell

51

(Williams), 641 F.3d at 1258; Powell, 643 F.3d at 1303-05; DeYoung, 646 F.3d at 1325; Valle, 655 F.3d at 1233. Instead, Arthur argues that our previous opinions in those cases are not "'binding precedent' that control the outcome of Mr. Arthur's case."

As this Court expressly did in Powell, DeYoung, and Valle, I reject the contention that we are not bound by our earlier precedent on the effect of the pentobarbital substitution on the statute of limitations. See DeYoung, 646 F.3d at 1325 ("DeYoung acknowledges the Powell decision is on point, but argues that the evidence he proffered in this record undermines the premise of Powell. However, 'the mere act of proffering additional reasons not expressly considered previously will not open the door to reconsideration of the question by a second panel.'"); Powell, 643 F.3d at 1304-05 ("Powell's attempts to circumvent the holding of Powell(Williams) fall flat. . . . [I]n light of our binding precedent, we are obliged to reject Powell's attempt to relitigate the issue of whether the ADOC's action in changing the first drug in the lethal injection protocol from sodium thiopental to pentobarbital is a 'significant' change . . . ."); see also Valle, 655 F.3d at 1232 ("Plaintiff's attempt to distinguish his claim from the binding Powell precedent, based upon the Blankenship execution and the affidavit of Dr. Waisel relied upon by Valle, is significantly undermined if not totally foreclosed

52

by DeYoung []." (citation omitted)).

The district court correctly held that Arthur's Eighth Amendment claim was filed outside the limitations period, based on our holdings in Powell (Williams), Powell, DeYoung, and Valle. We have held a number of times that a prior panel precedent cannot be circumvented or ignored on the basis of arguments not made or factors not considered by the prior panel. See, e.g., Tippitt v. Reliance Standard Life Ins. Co., 457 F.3d 1227, 1234 (11th Cir. 2006) ("[A] prior panel precedent cannot be circumvented or ignored on the basis of arguments not made to or considered by the prior panel."); Saxton v. ACF Indus., 239 F.3d 1209, 1215 (11th Cir.) ("That holding [of the earlier panel] is the law of this Circuit regardless of what might have happened had other arguments been made to the panel that decided the issue first." (quotation marks and citation omitted)), rev'd en banc on other grounds, 254 F.3d 959 (11th Cir. 2001) (en banc); Smith v. GTE Corp., 236 F.3d 1292, 1302-03 (11th Cir. 2001) (categorically rejecting an "overlooked reason" exception to the prior panel precedent rule); Turner v. Beneficial Corp., 236 F.3d 643, 650 (11th Cir.) ("Nor is the operation of the rule dependent upon the skill of the attorneys or wisdom of the judges involved with the prior decision—upon what was argued or considered."), rev'd en banc on other grounds, 242 F.3d 1023 (11th Cir. 2001) (en banc); Cohen v. Office Depot, Inc.,

204 F.3d 1069, 1076 (11th Cir. 2000) (same).

Arthur contends we are not bound by our prior decisions about the significance of the switch to pentobarbital because it is a factual issue, not a legal question. However, the "interpretation and application of a statute of limitations is a question of law." Lawrence v. Florida, 421 F.3d 1221, 1224 (11th Cir. 2005); accord United States v. Trainor, 376 F.3d 1325, 1330 (11th Cir. 2004) (stating that the "application of [a] statute of limitations is [a] question of law reviewed de novo"). And our precedent has already held that the substitution of pentobarbital for sodium thiopental is not a significant change in Alabama's lethal injection protocol to restart the statute of limitations clock. See Valle, 655 F.3d at 1233; DeYoung, 646 F.3d at 1325; Powell, 643 F.3d at 1304-05; Powell (Williams), 641 F.3d at 1258.[14]

Alternatively, to the extent there is a mixed question of law and fact as to whether the change to pentobarbital is a significant alteration, the prior panel precedent rule obligates us to apply a prior panel decision "to facts and circumstances sufficiently similar to those under which [the prior decision] arose,"

_____

[14]In any event, the statute of limitations question at issue here does not turn on a broad fact-intensive inquiry into how Alabama administers its lethal injection protocol, but rather on the narrow issue of whether the substitution of pentobarbital for sodium thiopental constitutes a "significant alteration." This explains why this Court held that the Powell (Williams) and Powell holdings as to Alabama's protocol were binding precedent as to the same challenges to Georgia's and Florida's switch to pentobarbital.

Anders v. Hometown Mortg. Servs., Inc., 346 F.3d 1024, 1031 (11th Cir. 2003), and here, the "facts and circumstances" are nearly, if not completely, identical.

The ADOC lethal injection protocol challenged in Powell (Williams) and Powell is identical to the protocol challenged by Arthur. In all three Alabama cases (and in Georgia's DeYoung and Florida's Valle as well), the claim is that the use of pentobarbital creates a substantial risk of serious harm because of the possibility that it will not timely render the inmate unconscious and insensate before administration of the second and third drugs in the protocol.

Likewise, the factual bases of the claims are nearly identical. Arthur neither alleges nor attaches to his complaint any new scientific or medical evidence about pentobarbital. Instead, his complaint makes the same factual contentions that were considered and rejected in Powell (Williams), Powell, DeYoung, and Valle. Indeed, Arthur even attaches to his complaint the expert report of Dr. Dershwitz, which was the same key evidence in Powell (Williams).

Arthur contends his case is not about the dosage of pentobarbital but rather about the amount of time needed for pentobarbital to render an inmate unconscious before the second drug is given. But, as shown above, how fast-acting or how long it takes for pentobarbital to act was expressly part of the allegations in the prior cases. In Powell (Williams), Williams alleged that: (1)

55

pentobarbital is not interchangeable with sodium thiopental because pentobarbital is a longer-acting barbiturate than thiopental; (2) pentobarbital is not used clinically to induce anesthesia, but is instead a sedative; (3) "pentobarbital is not an agent used medically to induce loss of consciousness and loss of sensation because of the extended length of time it takes for the drug to act"; (4) pentobarbital is less lipid-soluble than sodium thiopental, "causing the slower onset of anesthesia after intravenous injection"; and (5) pentobarbital's lack of clinical testing precludes an accurate assessment of its proper dosage or its efficacy. In Powell, Powell alleged that: (1) sodium thiopental is an anesthetic, whereas pentobarbital is a sedative; (2) sedation is not the same as a loss of consciousness and sensation; (3) the lack of clinical history of pentobarbital as an anesthetic puts the inmate at an undue risk of suffering; and (4) pentobarbital is not effective to induce loss of consciousness "because of the extended length of time it takes." And although Arthur's complaint details the story of the Powell and Blankenship executions, DeYoung and Valle featured the same reports of witnesses from the Powell and Blankenship executions, but the DeYoung Court already held that evidence did not show a substantial risk of serious harm and in any event did not restart the statute of limitations clock. DeYoung, 646 F.3d at 1325-27; see Valle, 655 F.3d at 1228-38 (evaluating evidence regarding the

56

Blankenship and Powell executions and ultimately holding that the appellant's lethal injection action was time barred); see also Jackson v. Danberg, 656 F.3d 157, 163-64 & n.6 (3d Cir. 2011) (concluding use of pentobarbital did not create or demonstrate risk of severe pain despite the inmate's presentation of evidence concerning the Blankenship and Powell executions).[15]

In short, the district court correctly applied our binding circuit precedent in holding that Arthur's Eighth Amendment claim was barred by the statute of limitations.

Although I believe we are bound by our own precedent, I note that every other circuit to consider the issue has uniformly concluded that the use of pentobarbital, in lieu of sodium thiopental, as the first drug in lethal injection executions is constitutional. See Jackson, 656 F.3d at 162-65; Pavatt v. Jones, 627 F.3d 1336, 1339-40 (10th Cir. 2010); see also Beaty v. Brewer, 649 F.3d 1071, 1075-76 (9th Cir. 2011) (Kozinski, J., concurring in denial of rehearing en banc) (stating inmate had challenged substitution of pentobarbital for sodium thiopental, noting that Tenth and Eleventh Circuits had rejected similar claims, and

---

[15]Moreover, under Alabama's protocol, the execution cannot proceed until three consciousness checks are performed. Even Arthur's own evidence shows that the 2,500 mg dose of pentobarbital produces unconsciousness and lack of sensation in inmates. And what is more, Alabama has instituted procedural safeguards—the three different types of consciousness checks—to confirm the loss of consciousness before administration of the second drug.

57

concluding that petitioner had failed to show any deficiency in Tenth or Eleventh

Circuit's analysis). Indeed, the Third Circuit pointed out how pentobarbital is

commonly used to euthanize terminally ill patients and that there is no scientific

evidence that pentobarbital "fails to render an inmate unconscious":

> "Pentobarbital is a barbiturate commonly used to euthanize terminally ill patients who seek death with dignity in states such as Oregon and Washington." Beaty v. Brewer, 649 F.3d 1071, at 1075, 2011 WL 2040916, at *4 (9th Cir. 2011) (denying rehearing en banc because inmate had no likelihood of success on Eighth Amendment claim based on pentobarbital). It has been used successfully for executions in at least four other states, and there is no evidence that it fails to render an inmate unconscious.

Jackson, 656 F.3d at 165.[16] Here, Arthur's own voluminous evidence, attached to

his complaint, shows pentobarbital works.

**B.    Due Process Claim**

Similarly, I conclude that the district court properly applied our precedent in

dismissing as barred by the statute of limitations Arthur's Due Process claim as to

the secrecy of Alabama's lethal injection protocol. In Powell, we expressly noted

that the ADOC's alteration in its lethal injection protocol to substitute the use of

pentobarbital for sodium thiopental was not a significant alteration either for

purposes of an inmate's claim that he had a right to know the details of his

---

[16]Since early 2011, twelve states (including Alabama) have used pentobarbital in carrying out at least 44 executions. See http://www.deathpenaltyinfo.org (Last visited March 20, 2012).

58

execution or "for purposes of a statute of limitations' triggering date." Powell, 643 F.3d at 1304-05. We also stated that Powell's very claim "about the secrecy surrounding the ADOC's recent change in lethal injection protocol" was "rejected by this Court in Powell(Williams), which . . . constitutes binding precedent." Id. at 1305.  As with Arthur's Eighth Amendment claim, his Due Process claim rests upon the same factual allegations and legal arguments that were considered and rejected in Powell (Williams) and Powell.

Moreover, and in any event, Arthur has pointed to no facts in this record that would indicate that his Due Process claim did not arise or could not have been brought in 2002, when Alabama established its lethal injection protocol.  See Powell, 643 F.3d at 1305 ("Powell could have challenged the ADOC's 'secrecy' surrounding the method of execution beginning July 31, 2002, as the facts supporting this cause of action should have been apparent to any person with a reasonably prudent regard for his rights. . . .  Powell fails to show how his claim about the secrecy surrounding the ADOC's recent change in lethal injection protocol was revived by the ADOC's 2011 switch in drugs.").  The district court properly dismissed this claim.

C.    **Equal Protection Claim**

I also conclude that the district court correctly dismissed Arthur's equal

59

protection claim under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. As stated above, to survive dismissal under Rule 12(b)(6), a plaintiff's complaint "must contain factual allegations that, if true, would 'raise a right to relief above the speculative level.'" Speaker, 623 F.3d at 1380. And, to state an equal protection claim, Arthur must show: (1) "that the State will treat him disparately from other similarly situated persons," and (2) that the disparate treatment burdens a fundamental right, targets a suspect class, or is not rationally related to a legitimate government interest. DeYoung, 646 F.3d at 1327-28; Houston v. Williams, 547 F.3d 1357, 1363 (11th Cir. 2008).

Arthur alleges that the third consciousness check (the arm pinch) was not performed during the Powell execution, and this failure indicates that Arthur himself will be treated differently than the ADOC treats other inmates (except for Powell, presumably) being executed under the lethal injection protocol. Arthur alleges that this disparate treatment burdens his fundamental Eighth Amendment right to be free from cruel and unusual punishment because it creates a substantial risk that he will suffer serious harm during his execution.

Arthur has wholly failed to meet his burden of alleging facts that would plausibly show either disparate treatment or the burdening of a fundamental right. All Arthur has alleged in support of his equal protection claim is that two of the

60

witnesses to Powell's execution (Powell's attorneys) saw ADOC officials perform

the first two consciousness checks on Powell but did not see the third check—the

arm pinch.[17]  The undisputed evidence, however, is that Powell was unconscious

before the second and third drugs were administered.

Even assuming that ADOC officials did not perform the third consciousness

check during the Powell execution, it is no more than rank speculation to conclude

that ADOC officials will in the future treat Arthur differently than similarly

situated inmates.  Arthur has alleged no pattern, practice, or even reason for the

alleged failure to perform the arm pinch, and none can reasonably be inferred.

There are only Arthur's admissions that two consciousness checks in the ADOC's

protocol were performed on Powell and one isolated report of an alleged failure to

follow the third consciousness check in the ADOC's protocol.  There is nothing

more than speculation that it will occur again, much less that it will occur in

Arthur's case.

Furthermore, Arthur's own experts do not indicate that the arm pinch is

necessary to prevent a substantial risk of serious harm that would constitute an

Eighth Amendment violation.  Dr. Lubarsky stated in his declaration that

---

[17]The affidavits of Anne Hill and Warden Patterson report that all three consciousness checks were performed.  But for purposes of this appeal, I focus on Arthur's evidence.

"[p]inching an inmate's arm after the administration of pentobarbital, especially by someone who is not extensively trained, <u>is not an acceptable way to determine consciousness</u>." (Emphasis added.) Dr. Heath, though he termed the arm pinch "one of the key aspects of [the ADOC] protocol," did <u>not</u> allege that the failure to perform the pinch would create a substantial risk of serious harm. Instead, Dr. Heath merely indicated that if the ADOC is not performing the arm pinch consciousness check, "it demonstrates an unacceptable sloppiness or lack of diligence on the part of the ADOC, and means that the ADOC cannot be relied upon to administer lethal injection in a humane fashion." In other words, Dr. Heath appears to allege not that the failure to perform the arm pinch consciousness check itself creates a substantial risk of serious harm, but that such failure furnishes evidence indicating that the ADOC may also fail to perform <u>other features</u> of its protocol, and <u>those other failures</u> will create a substantial risk of serious harm. And again, in light of our own precedent, Arthur has not shown either (1) that pentobarbital fails to achieve unconsciousness and lack of sensation before the second drug is administered, or (2) even in the Powell execution, that Powell was not unconscious before he was given the second drug in the protocol. Thus, even if Arthur could show the failure to perform the third consciousness check on Powell would result in disparate treatment of Arthur, he has not alleged

62

enough facts that, if taken as true, would show that the failure to perform Powell's arm pinch burdens Arthur's Eighth Amendment right.

I conclude that the district court did not err in dismissing Arthur's equal protection claim.

## IV. CONCLUSION

For the reasons stated above, our precedent requires that we affirm the dismissal of Arthur's complaint. I respectfully dissent.